IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

IN ADMIRALTY (In Personam)

ALLIANZ GLOBAL CORPORATE & SPECIALTY
SE a/s/o SOL GROUP MARKETING COMPANY,
SOL GROUP MARKETING COMPANY, and
AGRIEX SHIPPING LIMITED,

    Plaintiffs,                              Case No.:

v.

M/V AS FELICIA her engines, boilers, machinery, etc. *in rem*; AS FELICIA OPCO B.V.; AS FELICIA SCHIFFAHRTSGESELLSCHAFT MBH & CO. KG; MPC CONTAINER SHIPS ASA and AHRENKIEL STEAMSHIP GMBH & CO KG, *in personam.*

    Defendants.
_____/

## **VERIFIED COMPLAINT**

Plaintiffs, by and through their attorneys, CASEY & BARNETT LLC and HENKEL & COHEN, P.A., as and for their Complaint, allege as follows:

### **JURISDICTION**

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Jurisdiction is predicated upon 28 U.S.C. §1333.

2.    All the Parties have consented to have this dispute heard in this District.

### **PARTIES**

3.    At all material times, Allianz Global Corporate & Specialty SE (hereinafter "Allianz") was and is a corporation organized and existing by virtue of the laws of Germany with an office and place of business located at Kapstadtring 2, Hamburg 22297, Germany and was the subrogated underwriter of a consignment of the Melons, as more specifically described below.

4. At all material times, Sol Group Marketing Company (hereinafter "Sol Group") was and is a Florida corporation with an office and place of business located at 1751 SW 8th Street, Pompano Beach, Florida 33069, and was the owner, consignee and/or assured of the consignment of the Melons laden on board the M/V AS FELICIA that is the subject matter of this litigation, as more specifically described below.

5. At all material times, Agriex Shipping Limited (hereinafter "Agriex") was and is a foreign corporation with an office and place of business located at 29 North Anne Street, Dublin 7, Republic of Ireland, and was and is the company that chartered the M/V AS FELICIA to transport by ocean the Melons laden on board the M/V AS FELICIA.

6. At all material times, defendant M/V AS FELICIA (hereinafter "MV AS FELICIA" or "the Vessel"), IMO No. 9395020, is an ocean-going container ship owned, operated and maintained by defendants, as more specifically described below, that carried containerized cargo, including the Melons, which is the subject matter of this lawsuit, from Guatemala and Honduras to the United States and may be within the jurisdiction of this Honorable Court during the pendency of process hereunder.

7. At all material times, defendant, AS Felicia OpCo B.V. (hereinafter "AS Felicia") was and is a corporation organized and existing by virtue of the laws of a foreign state with an office and place of business located Stawinskylaan 835 World Trade, Amsterdam, 1077 XX, The Netherlands, and, effective November 15, 2017 through the present was the registered owner of the Vessel and was acting in the capacity of a common carrier and/or operator and/or time charter owner and/or manager of the Vessel, and also at all relevant times was and is doing business within the jurisdiction of this Honorable Court.

8. At all material times, defendant, AS Felicia Schiffahrtsgesellshaft mbH & Co KG (hereinafter "AS Felicia") was and is a corporation organized and existing by virtue of the laws of a foreign state with an office and place of business located at Palmaille 75, Hamburg 22767, Germany, and, through at least November 15, 2017 was the registered owner of the Vessel and was acting in the capacity of a common carrier and/or operator and/or time charter owner and/or manager of the Vessel, and also at all relevant times was and is doing business within the jurisdiction of this Honorable Court.

9. At all material times, defendant, MPC Container Ships ASA (hereinafter "MPC") was and is a corporation organized and existing by virtue of the laws of a foreign state with an office and place of business located Dronning Mauds gate 3, Oslo N-0250, Norway, and, effective November 15, 2017 through the present was the Commercial Operator of the Vessel and was acting in the capacity of a common carrier and/or operator and/or manager of the Vessel, and also at all relevant times was and is doing business within the jurisdiction of this Honorable Court.

10. At all material times, defendant, Ahrenkiel Steamship GmbH & Co KG (hereinafter "Ahrenkiel") was and is a corporation organized and existing by virtue of the laws of a foreign state with an office and place of business located Palmaille 75, Hamburg 22767, Germany, and, (a) prior to November 15, 2017 was the Commercial Operator of the Vessel and was acting in the capacity of a common carrier and/or operator and/or manager of the Vessel; and (b) effective November 15, 2017 through the present was the Technical Manager of the Vessel and was acting in the capacity of a common carrier and /or operator and or manager of the vessel responsible for its maintenance and repair, and also at all relevant times was and is doing business within the jurisdiction of this Honorable Court.

11. At all material times, defendants were and still are engaged in the business of common carriage of merchandise by water for hire, and owned, operated, managed, chartered, maintained, crewed and/or otherwise controlled the M/V AS FELICIA, as common carriers of merchandise by water for hire.

12. Plaintiffs bring this action on their own behalf and as agents and/or trustees on behalf of and for the interest of all parties who may be or become interested in the said consignment, as their respective interests may ultimately appear, and Plaintiffs are entitled to maintain this action.

## **RELEVANT FACTS**

### The Service

13. Sol Group Marketing Company ("Sol Group") is engaged in the business of, *inter alia*, the marketing, distribution, and sale in North America, including the United States, of fresh and perishable melons, including cantaloupes, watermelons, and honeydews, grown, packed, and shipped from Honduras and Guatemala (the "Melons").

14. Sol Group, a separate company, is an ultimately owned through other companies by Fyffes, an international produce company headquartered in Ireland and owned by Sumitomo, a publicly-held Japanese company.

15. Agriex Shipping Limited, a separate company also owned by Fyffes, provides ocean transportation of the Melons from Central America to various ports in the U.S. to Sol Group.

16. The Central America melon export season runs generally from November to May of each year.

17. During the first part of the season and in more recent years, Sol Group and Agriex arrange for a two-vessel service from Central America to the United States, docking in Port

Everglades, Florida and the Port of Philadelphia, Pennsylvania. On the return trip, the vessels haul the empty refrigerated shipping containers ("reefers") back to Central America so that they can be loaded with more of the Melons for transportation back to the U.S.

18. Later in the season and in recent years, a third vessel is added to the service and may bring in the Melons, including to ports in Texas and\or California.

19. On October 17, 2017, Agriex, acting to arrange for transportation of the Melons to Sol Group, entered into a Time Charter Party (hereinafter the "Charter Party"), as named charterer, with AS Felicia Schiffahrtsgesellschaft mbH & Co KG, who was acting in the capacity of Owner, for the use of the M/V AS FELICIA commencing on or about November 15, 2017 to ship the Melons from Central America to the U.S. and to ship the empty reefers back to Central America.

20. Agriex intended to utilize the chartered vessel to transport to Sol Group the Melons from Guatemala and Honduras to Port Everglades and\or the Port of Philadelphia.

21. According to the charter party, Owners were due to substitute the M/V AS Fabrizia for the M/V AS FELICIA in February 2018.

22. The M/V Warnow Whale was the other vessel chartered by Agriex for the Sol Group 2017-2018 melon season.

23. Pursuant to the terms of the Charter Party, Cl 8, the Owners of the vessel were to be responsible for paying crew wages, maintaining the vessel's class, and keeping the vessel in a thoroughly efficient state in hull, machinery and equipment during the service period.

24. Pursuant to the terms of the Charter Party, Cl 8, Agriex had authority to issue bills of lading which were in conformity with the mate's receipts evidencing the quantity and condition of the cargo.

The Incident

25. On or about January 23, 2018, Sol Group arranged for the loading of 90 containers consisting of 67,510 boxes of the Melons on board the M/V AS FELICIA in the port of Santo Tomas, Guatemala for transportation to Philadelphia, Pennsylvania.

26. Agriex issued bills of lading numbered GUA181068, and GUA181092 through GUA181181, inclusive, all dated January 23, 2018, for the Melons loaded on board the M/V AS FELICIA in Santo Tomas, Guatemala. The consignee listed on each of the aforesaid bills of lading issued by Agriex was Sol Group.

27. On or about January 25, 2018, Sol Group arranged for the loading of 294 containers consisting of 315,283 boxes and bins of the Melons on board the M/V AS FELICIA in the port of Puerto Cortes, Honduras for transportation to Philadelphia, Pennsylvania.

28. Agriex issued bills of lading numbered G181045 – G181338, inclusive, all dated January 25, 2018, for the Melon cargo loaded on board the M/V AS FELICIA in Puerto Cortes, Honduras. The consignee listed on each of the aforesaid bills of lading issued by Agriex was Sol Group.

29. On or about January 25, 2018, upon the completion of cargo operations in Puerto Cortes, Honduras, the vessel sailed for her intended destination of Philadelphia, Pennsylvania, where she was due to arrive with the highly perishable cargo of the Melons on January 30, 2018.

30. Meanwhile, the M/V WARNOW WHALE had discharged her cargo in Port Everglades on January 26 through 27, 2018 and was returning to Central America, with a planned return to Port Everglades on or about February 2, 2018.

31. Sol Group's planning was for one vessel arriving in Port Everglades each week based upon customer demand and limited storage capacity at its Florida cold storage warehouse.

The other vessel would transport melons to the Port of Philadelphia and the Melons was stored in a Pennsylvania cold storage warehouse hired by Sol Group.

32. On January 27, 2018, at approximately 1712 hours local time, while in transit from Central America towards Philadelphia, the vessel suffered a breakdown of the main engine's turbocharger.

33. Upon information and belief, on January 27, 2018, at approximately 1907 hours local time, due to the severity of the incident, the Owners instructed the vessel to seek refuge in the port of Port Everglades, Florida, the nearest port to the then current location of the vessel, for the purpose of undergoing necessary repairs.

34. The vessel arrived in Port Everglades, Florida on January 29, 2018.

35. After Owners conducted an inspection of the damage, they advised that the vessel repairs would not be completed before February 11, 2018 due to the necessity of having to ship spare parts to the vessel. This would result in a delay of at least two weeks from the originally scheduled arrival date. Due to the perishable nature of the cargo of the Melons, the entire cargo would have been a total loss if Sol Group accepted this option.

36. In addition, Owners informed that they would not provide a replacement vessel or any other assistance in transporting the cargo to its intended destination of the Port of Philadelphia.

37. Sol Group, in an effort to reasonably mitigate its potential losses, opted to discharge the entire cargo in Port Everglades, and make alternative arrangements to transport and market the cargo to its customers.

38. Sol Group incurred two categories of expenses in its effort to mitigate its potential losses and Agriex also incurred a separate category of expenses in respect to the mitigation effort.

39. First, Sol Group incurred increased freight costs for sales orders which Sol Group undertook to deliver to its customers by hiring trucking companies to perform the transportation of the Melons from Florida, rather than from Pennsylvania. Sol Group delivered a total of 2,076 pallets of the Melons to its customers via arrangements made by, and paid by, Sol Group. The total additional cost incurred by Sol Group for the trucking charges of the 2,076 pallets was $182,567.00.

40. Second, due to the mispositioned cargo (where the Melons was unloaded in Port Everglades rather than in Pennsylvania) caused by the M/V AS FELICIA breakdown, Sol Group had an overabundance of cargo in one location (Florida) and an insufficient amount of cargo in the other location (Pennsylvania). This resulted in a loss sustained by Sol Group in the amount of $491,684.00 in reduced sales prices.

41. As a result of the foregoing incident and Sol Group's mitigation decisions, when the M/V WARNOW WHALE arrived in Port Everglades on February 2, 2018, there was insufficient warehouse space for the cargo laden on board. Thus Sol Group unloaded only a portion of the cargo in Port Everglades and sent the partially loaded M/V WARNOW WHALE on to Philadelphia where the balance of the cargo was discharged, and empty containers in Philadelphia were then loaded for the return voyage to Central America. Due to the extra length of the WARNOW WHALE transit, by going to Philadelphia, Sol Group needed the vessel back in Central America to load the cargo that had been scheduled to be loaded on the next voyage of the M/V AS FELICIA as well as the cargo planned for the next voyage of the M/V WARNOW WHALE. As such, Sol Group did not have the option of having the M/V WARNOW WHALE make another port call in Port Everglades to haul empty containers from Port Everglades to Central America.

42. The M/V AS FEBRIZIA, as alleged above, was due to be substituted in place of the M/V AS FELICIA in February 2018. Owners advised that the M/V AS FEBRIZIA would be available as of February 9, 2018. Due to Sol Group's fears that the harvested melons would rot in Central America if not transported, the M/V AS FEBRIZIA was directed to Central America to load the waiting the Melons. The M/V AS FEBRIZIA arrived in Honduras on February 10, 2018 and loaded the week-old melons to Philadelphia. As a result of this decision, Sol Group avoided a further loss, as it was able to get the fruit to its customers before it suffered serious deterioration.

43. To solve the issue of having empty reefer containers sitting in Florida and thus unavailable for use in Central America, Agriex chartered the M/V SPAARNAGRACHT for one voyage to take the empty containers from Port Everglades and return them to Central America, where they could be re-utilized in the service.

41. The M/V SPAARNEGRACT arrived in Port Everglades on February 6, 2018,the empty containers were loaded onto the ship, and it returned the empty containers to Honduras. The expenses incurred by Agriex to return the empty containers to Honduras was $378,318.00.

42. The return of the southbound empty containers was critical in the supply chain. Without sufficient containers in the rotation, the harvesting and transportation to the U.S. of the Melons would have been delayed with damage to the perishable melons as there would have been an insufficient quantity of refrigerated containers available to transport the cargo on the container vessel utilized in this service.

43. Due to the mitigation efforts of Sol Group, there was no physical damage sustained to any of the cargo.

44. The expenses incurred by Sol Group and Agriex in lessen the claim, which claim totals only $1,052,566.00 because of these mitigation efforts, was not the result of any act or

omission on the part of the Plaintiffs but, to the contrary, was due solely as the result of the negligence, fault, neglect, lack of due diligence, breach of contract, and\or breach of bailment on the part of the Defendants.

45. At all times relevant hereto, a contract of insurance for property damage was in effect between Sol Group and Allianz, which provided coverage for, among other things, loss or damage to the consignment as well as Sue and Labor expenses incurred by Sol Group during the subject transit.

46. Pursuant to the aforementioned contract of insurance between Sol Group and Allianz, monies have been expended on behalf of Sol Group to the detriment of Allianz due to the Sue and Labor expenses incurred during the subject transit.

47. As Allianz has sustained damages as a result of said expenditures, expenditures rightly the responsibility of the Defendants, Allianz has an equitable right of subrogation and is subrogated, to the extent of its expenditures, to the rights of its insured with respect to any and all claims for damages against the defendants, up to $548,827.60, the amount paid under the applicable insurance policy, as per the policy provisions, which included a $414,125.40 deductible, which remains a claim being asserted directly by Sol Group and/or Agriex. In addition, a portion of the expenses incurred to transport the empty containers southbound were not covered by the Allianz policy, totaling $89,613.00, which are being claimed directly by Agriex against Defendants.

48. By reason of the foregoing, Plaintiffs have sustained losses which will be shown with specificity at trial, no part of which has been paid, although duly demanded, which are presently estimated to be no less than $1,052,566.00.

## **AS AND FOR A FIRST CAUSE OF ACTION**

### **(Breach of Contract)**

49.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48, inclusive, as if herein set forth at length.

50.     Pursuant to the contracts of carriage entered into by and between the parties, the defendants owed contractual and statutory duties to the aforementioned cargo owners to carry, bail, keep and care for, protect and deliver the Plaintiffs' cargoes in the same good order and condition and to the agreed upon destination, as at the time said Defendants first accepted custody and control of the goods.

51.     The Defendants breached their contractual and statutory duties by failing to properly carry, bail, keep and care for, protect and deliver the Plaintiffs' cargoes to the agreed destination, as at the time said Defendants first accepted custody and control of the goods.

52.     As a direct and proximate result of said breach of contract by Defendants, the Plaintiffs have suffered damages presently estimated to be no less than $1,052,566.00.

## **AS AND FOR A SECOND CAUSE OF ACTION**

### **(Bailment)**

54.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1 through 48, inclusive, as if herein set forth at length.

55.     At the time of the aforementioned incident, defendants together with the entities they hired to act on their behalf, were acting as bailees of the aforementioned cargoes and in their own capacity, or through their contractors, agents, servants, or sub-bailees, had a duty to safely and properly keep, care for and deliver the shipment in the same good order and condition as when entrusted to them and to the agreed destination. Defendants also had a duty to ensure that the

services provided for the shipment were performed with reasonable care and in a non-negligent and workmanlike manner.

56. Defendants breached their duties and obligations as bailees by failing to properly carry, bail keep and care for, protect and deliver the Plaintiffs' cargoes to the agreed destination, as at the time said Defendants first accepted custody and control of the goods.

57. As a direct and proximate result of said breach of contract by Defendants, the Plaintiffs have suffered damages presently estimated to be no less than $1,052,566.00.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Negligence)

59. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1 through 48, inclusive, as if herein set forth at length.

60. The Defendants owed a duty to the Plaintiffs' cargoes to carry, bail, keep and care for, protect and deliver the aforementioned cargoes in the same good order and condition and to the agreed upon destination as at the time said Defendants first accepted custody and control of the goods.

61. The Defendants breached and were negligent in exercising their duty to carry, bail, keep and care for, protect and deliver the Plaintiffs' cargoes to the agreed upon destination as at the time said Defendants first accepted custody and control of the goods.

62. As a direct and proximate result of the negligent acts committed by Defendants, the Plaintiffs have suffered damages presently estimated to be no less than $1,052,566.00.

## **AS AND FOR A FOURTH CAUSE OF ACTION**

### **(Maritime Lien)**

64. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1 through 48, inclusive, as if herein set forth at length.

65. As the owners, operators, charterers and /or managers of the M/V AS FELICIA, Defendants were responsible for properly manning, maintaining and repairing the vessel and for otherwise exercising due diligence to ensure that the vessel was seaworthy and fit to carry cargoes that were delivered to and loaded on board the M/V AS FELICIA.

66. The losses sustained by plaintiffs were caused, in whole or in part, by the negligence and fault of defendants, and /or their agents, representatives and independent contractors for whose acts and omissions it was responsible, including but not limited to, their failure to properly manage, and operate the M/V AS FELICIA in a seaworthy condition, failure to properly man the vessel and to train its officers and crew, and in failing to properly maintain the vessel, its hull, and machinery.

67. Plaintiffs have a maritime lien on the M/V AS FELICIA as a result of her breakdown and the resulting damages incurred by Plaintiffs due to the unseaworthy condition of said vessel.

68. As a direct and proximate result of said breach of contract by Defendants, the Plaintiffs have suffered damages presently estimated to be no less than $1,052,566.00.

**WHEREFORE,** Plaintiffs pray:

1. That process in due form of law may issue against Defendants citing them to appear and answer all and singular the matters aforesaid;

2. That Judgment may be entered in favor of Plaintiffs against Defendants, jointly and severally, for the amount of Plaintiff's compensatory and, as alleged herein, special damages in the amount of at least $1,052,566.00, together with interest, costs and the disbursements of this action; and

3. That this Court grant to Plaintiff such other and further relief as may be just and proper.

Dated: Miami, Florida
December 21, 2020

| | |
|---|---|
| **CASEY & BARNETT LLC**<br>Counsel for ALLIANZ GLOBAL CORPORATE & SPECIALTY SE a/s/o SOL GROUP MARKETING COMPANY, and Lead Co-Counsel for SOL GROUP MARKETING COMPANY, and AGRIEX SHIPPING LIMITED<br>305 Broadway<br>Suite 1202<br>New York, New York 10007<br>Telephone: (212) 286-0225<br>Fax: (212) 286-0261<br>Email: mfc@caseybarnett.com<br><br>By: \s\ *Martin Casey*<br>    MARTIN CASEY, ESQ.<br>      New York Bar No. 2094282*<br>       *(Pro Hac Vice Application to be Filed) | **HENKEL & COHEN, P.A.**<br>Local Co-Counsel for Sol Group Marketing Company and Agriex Shipping Limited<br>7480 SW 40th Street<br>Suite 450<br>Miami, Florida 33155<br>Telephone: (305) 971-9474<br>Fax: (786) 534-2607<br>Email: tdh@miamibusinesslitigators.com<br><br>By: \s\ *Tim Henkel*<br>    TIMOTHY D. HENKEL, ESQ.<br>      Florida Bar No.: 0817813 |

## VERIFICATION

Philip Harty, an officer for Sol Group Marketing Company, under penalty of perjury, states as follows:

That he has read the foregoing Verified Complaint and knows the contents thereof and that the same are true to his own knowledge, except as to the matters therein stated to be alleged on information and belief and as to those matters, he believes them to be true.

Deponent further states that the sources of his information and the grounds for his beliefs as to all matters stated to be alleged on information and belief is derived from documents, records, correspondence and memoranda of Plaintiffs concerning the matters set forth in the Verified Complaint in the possession of the deponent.

I affirm that the foregoing statements made by me are true under penalty of perjury.

Dated: December 17, 2020

_____
Philip Harty